UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CAR-FRESHNER CORPORATION and JULIUS SÄMANN LTD.,

                    Plaintiffs,

        v.

AMERICAN COVERS, LLC f/k/a AMERICAN COVERS, INC. d/b/a HANDSTANDS, ENERGIZER HOLDINGS, INC., and ENERGIZER BRANDS, LLC,

                    Defendants.

Civil Action No.:
5:17-cv-171 (TJM/ATB)

JOEL H. STECKEL, Ph.D., declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a Professor of Marketing and the Vice Dean for Doctoral Education at the Leonard N. Stern School of Business, New York University.  I have been retained by counsel for Plaintiffs CAR-FRESHNER Corporation ("CFC") and Julius Sämann Ltd. ("JSL") (collectively, "Plaintiffs") in the above-captioned litigation (the "Action") to review and respond to the opinions and analyses set forth by Hal Poret and David Neal.

2.      I make this Declaration in opposition to the Motion for Summary Judgment (the "Motion") that has been filed by Defendants American Covers, LLC f/k/a American Covers, Inc. d/b/a Handstands, Energizer Holdings, Inc. and Energizer Brands, LLC (collectively, "Defendants").

## PROFESSIONAL AND EDUCATIONAL BACKGROUND

3.      I have taught at the Leonard N. Stern School of Business, New York University, since January 1989. I was the Chairperson of the Marketing Department for six years, from July 1998 to June 2004. Since August 2016 I have been serving as the Acting Chairperson of the

school's Accounting Department. Prior to my promotion to Vice Dean, I was the faculty director of the Stern School Doctoral Program for five years, from May 2007 to July 2012. I have also held either permanent or visiting faculty appointments at the Graduate School of Business, Columbia University; the Anderson Graduate School of Management, U.C.L.A.; the School of Management, Yale University; and the Wharton School, University of Pennsylvania. I received my B.A. in Mathematics *summa cum laude* from Columbia University in 1977, and M.B.A., M.A. in Statistics, and Ph.D. in Marketing/Statistics from the Wharton School, University of Pennsylvania in 1979, 1980, and 1982, respectively. I was elected to Phi Beta Kappa at Columbia University and Beta Gamma Sigma at the Wharton School. These are the national honor societies for the respective disciplines I studied at these institutions.

4.      I was the Founding President of the INFORMS (Institute for Operations Research and Management Science) Society for Marketing Science, the foremost professional group for the development and application of management science theory and tools in marketing. In addition, I am a member of the American Marketing Association, the American Statistical Association, the Association for Consumer Research, the American Psychological Association, the American Association for Public Opinion Research, and the Society for Consumer Psychology.

5.      My fields of specialization within marketing include marketing research methodology, marketing and branding strategies, electronic commerce, and managerial decision making. I am an author of four books and over 50 articles. In the course of my scholarly research, teaching, and consulting work, I have studied issues of marketing research, branding, and their roles in consumer choice and marketing strategy.

3254644.5

6.      One of the books I co-authored is a textbook entitled *Marketing Research*. This book has been adopted at several of the country's major business schools. During one of my sabbaticals I served as an in-house consultant at the market research firm, Directions for Decisions (DFD), headquartered in Jersey City, New Jersey. DFD's growth allowed it to be acquired by RTi Research, another research firm, headquartered in Norwalk, Connecticut.

7.      I have sat on the editorial boards of many of our major journals over the years. Until last year, I served as a co-Editor-in-Chief of the journal *Marketing Letters*. In that capacity I evaluated over 200 research studies each year for six and a half years. I served as a gatekeeper, deciding what got published in the journal, and what did not. As such, my evaluations of the scientific reliability and validity of each study are subject to the scrutiny of the academic community. The community considers any study that does not conform to the scientific standards of my profession that appears in the journal as a black mark on my record. I consider the fact that the journal's publisher, the international firm, Springer-Verlag, kept me on long past the expiration of my term (July 2014) as validation of my performance in evaluating research. My professional qualifications are described further in my curriculum vita, which is attached as **Exhibit A**.

8.      During the course of my professional career, I have designed, conducted, supervised, and/or evaluated hundreds of consumer surveys. In that work I have formulated and evaluated sampling strategies, supervised and rendered opinions on sample selection, designed questionnaires, analyzed data, and interpreted results. I have also evaluated similarly purposed survey work performed by others.

3254644.5

9.      I have served as an expert witness on marketing research, marketing strategy, branding, trademark, and issues related to consumer decision making in a variety of litigation matters. In the past four years, I testified as an expert witness in the matters listed in **Exhibit B**.

## BACKGROUND

10.     According to the Amended Complaint, CFC has sold air fresheners bearing trademarks containing or comprising BLACK ICE ("the BLACK ICE marks").

11.     Also according to the Amended Complaint, CFC has used the trademark BAYSIDE BREEZE in connection with the sale of air fresheners.

12.     More recently, according to the Amended Complaint, Defendants started marketing air fresheners bearing the terms MIDNIGHT BLACK and ICE STORM together (hereinafter "MIDNIGHT BLACK ICE STORM").

13.     At or about the same time, according to the Amended Complaint, Defendants started marketing air fresheners bearing the term BOARDWALK BREEZE.

14.     I understand that Plaintiffs have filed this lawsuit against Defendants, alleging trademark infringement, false designations of origin, trademark dilution, and unfair competition under the Lanham Act, 15 U.S.C. §1051 *et seq*., and corresponding state law as a result of Defendants' activities related to the manufacture, marketing, promotion, advertising, distribution and sale of air fresheners with the names MIDNIGHT BLACK ICE STORM and BOARDWALK BREEZE.

15.     I understand that Defendants retained Mr. Hal Poret and Dr. David Neal in this Action.  I have reviewed the "Expert Report of Hal Poret," dated May 28, 2018 (the "Poret Report"), the data and materials cited by Mr. Poret in those reports, as well as the transcript of Mr. Poret's deposition on July 18, 2018 in this Action.  I have also reviewed the "Expert Report of David Neal Ph.D," dated May 28, 2018 (the "Neal Report"), the data and materials cited by

3254644.5

Dr. Neal in those reports, as well as the transcript of Dr. Neal's deposition on July 17, 2018 in this Action.

16.    According to the Poret Report, Mr. Poret conducted surveys to test the extent to which the names MIDNIGHT BLACK ICE STORM and BOARDWALK BREEZE create a likelihood of confusion with respect to Plaintiffs' BLACK ICE and BAYSIDE BREEZE marks, respectively.[1]

17.    According to the Neal Report, Dr. Neal conducted two sets of surveys.  The first set of surveys was reportedly intended to assess whether Plaintiffs' marks BLACK ICE and BAYSIDE BREEZE were "famous as a designation of source of air fresheners for automobiles among the general consuming public of the United States."[2] The second set of surveys reportedly set out to determine whether Defendants' marks MIDNIGHT BLACK ICE STORM and BOARDWALK BREEZE "cause likely purchasers of air fresheners for automobiles to form an association with Plaintiffs' mark(s)."[3]  The Neal report frames this second set of surveys as a test of "whether the Defendants' marks are, in fact, likely to cause dilution of Plaintiffs' marks."[4]

18.    Counsel for Plaintiffs have asked me to provide a professional review and commentary on the reports submitted by Mr. Poret and Dr. Neal in this Action.

## SUMMARY OF CONCLUSIONS

19.    For reasons discussed in detail below, my work in this matter has led me to conclude that (a) the Poret study lacks external validity, (b) the Poret study does not reflect a

---

[1] Poret Report, p. 7.

[2] Neal Report, p. 2.

[3] Neal Report, p. 3.

[4] Neal Report, p. 2.

3254644.5

marketplace context, (c) the presentation of stimuli in the Poret study is unbalanced, and (d) the Poret study uses inadequate controls.

20.     For reasons discussed in detail below, my work in this matter has also led me to conclude that (a) the Neal fame study diminished Plaintiffs' marks and consequently biased results against demonstrating fame, (b) the Neal association study contained confusing questions, (c) questions in both Neal studies were ambiguous, and (d) the Neal studies suffer from unreliable record-keeping, data collection and reporting.

21.     As discussed further below, it is my opinion that these aspects of the studies and the reports separately and together invalidate the studies presented in the Poret and Neal reports. As such, their conclusions cannot be relied upon with any degree of scientific certainty.

22.     My analysis in part rests on the seven-factor framework cited in the Federal Judicial Center's *Manual for Complex Litigation*.[5] According to that framework, a proper survey conforms to the following criteria: (a) the population was properly chosen and defined; (b) the sample chosen was representative of that population; (c) the questions asked were clear and not leading; (d) the data gathered were accurately reported; (e) the data were analyzed in accordance with accepted statistical principles; (f) the process was conducted to ensure objectivity; and (g) the survey was conducted by qualified persons following proper interview procedures.

## THE PORET STUDY IS INVALID AND UNRELIABLE

23.     The likelihood of confusion study described in the Poret Report purportedly queried 800 respondents, 400 for each of BLACK ICE and BAYSIDE BREEZE.[6]   All interviewing was reportedly done online.[7]

---

[5] *Manual for Complex Litigation*, Federal Judicial Center, Fourth Edition, 2004 ("Manual for Complex Litigation"), p. 103.

[6] Poret Report, p. 9.

24.    The Poret study reportedly used a test-control design.[8]  In each survey, the test group reportedly viewed a test product, Defendants' allegedly offending product (*i.e.* the one employing MIDNIGHT BLACK ICE STORM in the BLACK ICE survey and the one employing BOARDWALK BREEZE in the BAYSIDE BREEZE survey).[9]  The control group reportedly viewed a control product, which was reportedly Defendants' product with the terms at issue modified.[10]  The control product in the BLACK ICE survey was reportedly identical to the real Defendant product except that MIDNIGHT BLACK was replaced by "LIGHTNING BOLT," another name apparently used by the Defendants on one of their packages.[11]  The control product in the BAYSIDE BREEZE survey was also reportedly identical to the real Defendant product except that BOARDWALK BREEZE was replaced by "WATERSIDE WIND" on the package.[12]

25.    The Poret study reportedly used a sequential lineup approach in which respondents were exposed to Plaintiffs' product in two forms (hanging Tree and Vent Wrap form) and then subsequently shown four other air freshener products for cars and trucks in random order.[13]  One of those products was either the Defendants' allegedly offending product or a control product; the other three were third party offerings.[14]  As each product was shown, respondents were asked a series of questions on their computer screens about whether or not they

---

[7] Poret Report, p. 9.

[8] Poret Report, p. 9.

[9] Poret Report, p. 9.

[10] Poret Report, p. 9.

[11] Poret Report, p. 24.

[12] Poret Report, p. 32.

[13] Poret Report, p. 10.

[14] Poret Report, p. 10.

3254644.5

believed the product to be put out by or somehow connected with the company that made the Plaintiffs' product that they first saw.[15]

26.     The calculations in the Poret report followed the procedure of computing a level of confusion for each of the test and control group and then computing the net confusion as the difference between them.  The reported results were:[16]

|  | BLACK ICE SURVEY | BAYSIDE BREEZE SURVEY |
| --- | --- | --- |
| Test Group Confusion Rate | 27.0% | 28.0% |
| Control Group Confusion Rate | 25.0% | 26.5% |
| *NET CONFUSION RATE* | ***2.0%*** | ***1.5%*** |

27.     As discussed below, the Poret study was conducted in a manner that calls its data into question and renders its conclusions unreliable.

**The Poret Study Lacks External Validity**

28.     External validity refers to the extent to which we can generalize from the research setting to relevant populations specified in the real world.  In this instance, it reflects the degree to which we can have confidence that the findings of the Poret study reflect actual consumer behavior.

29.     The context in which a survey stimulus is presented is critical to the external validity of any consumer survey.  Contexts and settings govern the extent to which results from a survey can be generalized from the research sample to the target population and settings outside of the survey.  Consumer judgments are valid only insofar as they are made about stimuli that are viewed in the same manner in which they would be encountered in the real world.  The context

---

[15] Poret Report, p. 10.

[16] Poret Report, pp. 34, 35.

3254644.5

in which a stimulus is presented provides survey respondents with information they use in forming judgments when faced with a question about that stimulus.[17]

*The Poret Study Did Not Replicate a Marketplace Context*

30.    The Poret study did not replicate a marketplace context.  The Poret study used a sequential lineup format to provide the context for respondent judgments.  The main part of the interview began with respondents seeing two samples (one hanging Tree and one vent clip) of Plaintiffs' BLACK ICE or BAYSIDE BREEZE products followed by four other sample products seen one at a time.  This is not the way consumers see products in the marketplace.

31.    In the marketplace, it is my understanding the products at issue are often displayed on a rack, pegboard, or shelf so that consumers can choose from among various manufacturers, brands, or fragrances.  *See* **Exhibits C** and **D**.  If Plaintiffs' and Defendants' products are not side-by-side, they are most certainly in the same field of vision available for direct comparison in stores where both are sold.

32.    Encountering products or stimuli one after another, no matter how immediate, differs from encountering them at the same time.  Certainly, people engage in different types of information processing in sequential vs. simultaneous lineups.  More specifically, people engage in absolute judgment during sequential lineups. Respondents have to depend on their memories to make the judgment. In simultaneous lineups, people engage in relative judgment.

33.    The issue of sequential vs simultaneous lineup judgments has been studied in the field of criminology.  The findings of different studies vary, but the point to be made here is

---

[17] Sudman, Seymour, Norman M. Bradburn, and Norbert Schwartz, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*, Jossey-Bass Publishers, 1996, pp. 100-129.  The authors use the term "context" very broadly.  In particular, previously formed judgments, features of the judgment target or stimulus, and general norms all provide contexts from which respondents draw information.

simply that different formats produce different judgments.[18] That is precisely why the sequential vs. simultaneous lineup choice is so critical to the external validity of any study where the choice needs to be made.

34.     The Poret study should have employed a simultaneous lineup rather than the sequential lineup it did.   The Poret study approach invites respondents to make absolute judgments instead of comparative or relative ones.   Such a research protocol potentially inhibits respondent recognition of similarities between products and therefore is likely to artificially depress confusion estimates.

35.     The sequential lineup not only does not reflect how a consumer would encounter the products in the store, it does not reflect how a consumer would encounter the products online either.   While single pages portraying each product could very well exist online, consumers would not be exposed to them as they were in the Poret study.   The way they are likely to appear as a collection would be on a page of listings in response to a Google search or an Amazon search.   Consumers would not likely navigate to these products one at a time. Even if they did, the name of the product (*e.g.*, MIDNIGHT BLACK ICE STORM) would be prominent on other parts of the page apart from the image of the package itself.

36.     In addition, the Poret study forced respondents to view Plaintiffs' products for twenty seconds.[19]  Twenty seconds is a long time, much longer than a consumer normally spends viewing typical marketing stimuli, products, ads, etc.[20]   It is not clear what impact this had on

---

[18] Cf. Steblay, Nancy. K., Jennifer E. Dysart, and Gary L. Wells (2011), "Seventy-two Tests of the Sequential Lineup Superiority Effect: A Meta-Analysis and Policy Discussion," *Psychology, Public Policy, and Law*, 17, pp. 99–139.

[19] Poret Report, p. 12.

[20] Wedel, Michel and Rik Peters (2008), "A Review of Eye-Tracking Research in Marketing," *Review of Marketing Research,* Naresh Malhotra, ed., Vol. 5, Chapter 5, pp. 123-47.

respondents' responses. One possibility is that they studied the package in greater detail in the study than consumers would have in the store.

*Poret's Presentation of Stimuli Was Unbalanced*

37.     The Poret study presented two variants of the LITTLE TREES products, a hanging Tree and a Vent Clip, to respondents.  Respondents went on to view only one variant of each other product, including Defendants'.

38.     The Poret Report offers no explanation for this.  Plaintiffs' products are not the only ones with multiple variants. Certainly Defendants' products with the marks at issue come in multiple forms.

39.     This imbalance in Poret's presentation of stimuli created an unnecessary and artificial distinction between Plaintiffs' and Defendants' products. Such a distinction may have served to decrease the perceived similarity between the products and therefore depress perceived associations and the resulting confusion estimates.

**The Poret Study Used Inadequate Controls**

40.     In a survey intended to measure the likelihood of confusion, the proper purpose of a control stimulus is to account for possible alternative explanations for respondents' responses to the test stimulus (*i.e.*, possible explanations *other* than confusion), including guessing and yea-saying.

41.     In designing appropriate controls, the survey researcher should attempt to eliminate all possible alternative explanations for data to be obtained.  That way, and only in that way, can the researcher be confident in the conclusion.  If the control contains any allegedly infringing elements, what the survey researcher asserts is a control group measure may actually be an alternative measure of confusion.  Such is likely the case here with Poret's study.

3254644.5

42.     It is conceivable that Mr. Poret's control marks LIGHTNING BOLT ICE STORM and WATERSIDE WIND actually caused confusion among survey respondents.   After all, the first control contains the word "ice" and the second represents a similar alliteration with very similar trade dress (i.e. the sailboat on the package).   If that is the case, then Mr. Poret's control measures are actually measures of confusion and not controls for alternative explanations of any results that could be indicative of confusion.   Such a circumstance would produce test and control measures in the Poret study that are approximately equal and result in a very small net confusion.

43.     Evidence suggests that this is exactly what happened in the Poret study.   Jacoby (2002) writes that ideally it would be desirable for a control confusion estimate to not exceed 10 percent.[21]   Otherwise the control stimulus could itself be causing confusion.   If the control levels were 10 percent, and not 25 percent (BLACK ICE survey) and 26.5 percent (BAYSIDE BREEZE survey), the net confusion rates would have been 17.0 and 18.0 percent respectively, above a level which many courts have used as a confusion threshold.[22]

44.     Further evidence that the controls may have caused confusion can be drawn from an examination of the confusion levels of the distractor products in the Poret study (*e.g.* Yankee Candle MIDSUMMER'S NIGHT, Febreze Car MIDNIGHT STORM, Yankee Candle BEACH WALK, and Febreze Car LINEN AND SKY).   These levels are, with a couple of notable exceptions (Exotica EXOTICA ICE, Exotica FREEZE BREEZE), significantly lower than those of the two Poret control products and could have served as more appropriate controls.

45.     To illustrate, I focus on the data collected from Mr. Poret's question Q360, "Do you think that this product is made or put out by (the same company as/a different company

---

[21] Jacoby (2002), p. 932.

[22] Jacoby (2002), p. 931.

than) the products you were shown in the first section of the survey"?[23]   Poret reports 'same company' response percentages of 27.0% for Defendants' MIDNIGHT BLACK ICE STORM product and 25.0% for the control, which on the face of it points to no likelihood of confusion. What the Poret report does not report however are the 'same company' response percentages for the distractor products.  In the BLACK ICE survey, these are 22% for Exotica's EXOTICA ICE, 3.8% for Yankee Candle's MIDSUMMER'S NIGHT, and 4.3% for Febreze's MIDNIGHT STORM.

46.     These results suggest that had the Poret survey used control scents like MIDSUMMER'S NIGHT or MIDNIGHT STORM, the control confusion from Q360 would be in the neighborhood of 4 percent, much more suitable for a control.  This would reverse Mr. Poret's overall conclusion of no confusion.

47.     Given the above, it seems at least as likely (and probably more so) that the control products used in the Poret study are causing confusion than it is that they are useful controls.  As such, Mr. Poret's conclusion about no likelihood of confusion vanishes.

## THE NEAL STUDIES ARE INVALID AND UNRELIABLE

48.     Dr. Neal reportedly conducted two sets of studies to investigate whether (a) Plaintiffs' marks are famous and (b) whether Defendants' marks are likely to cause dilution of Plaintiffs' marks.[24]  The fame study reportedly focused on the investigation of fame and contained Survey 1 (for BLACK ICE) and Survey 2 (for BAYSIDE BREEZE). The association study reportedly focused on likelihood of dilution and contained Survey 3 (for BAYSIDE BREEZE) and Survey 4 (for BLACK ICE).

---

[23] Poret Report, Appendix B, p. 7.

[24] Neal Report, ¶1.7.

3254644.5

49.     The fame study reportedly recruited 1000 adult consumers from the population at large, 500 for each of Survey 1 (BLACK ICE) and Survey 2 (BAYSIDE BREEZE).[25]  The main part of these surveys reportedly began with unaided awareness questions for automobile air freshener fragrances.[26]  This was reportedly the same across both Survey 1 and Survey 2.  These questions were reportedly followed by a series of aided awareness questions framed in a grid in which respondents were asked to identify which (if any) of a set of possible fragrances they recognized.[27] BLACK ICE was reportedly one of the fragrances in Survey 1 and BAYSIDE BREEZE was reportedly one of those in Survey 2. The results of the fame study reportedly revealed that, after purportedly controlling for yea-saying by eliminating affirmative responses to a fictitious fragrance (AZTEC LEMON)[28], 37.2 percent of the sample were aware of BLACK ICE in Survey 1 and 25.1 percent of the sample were aware of BAYSIDE BREEZE in Survey 2.[29]

50.     Based on these reported results, Dr. Neal's report concludes "that the BLACK ICE and BAYSIDE BREEZE marks are not famous among the general consuming public of the United States as a designation of source for air fresheners for automobiles batteries."[30]  The word "batteries" makes no sense in this context.  I assume it is a typo.

51.     Dr. Neal's association study reportedly recruited over 600 respondents and exposed them to Defendants' marks, BOARDWALK BREEZE (Survey 3) and MIDNIGHT

---

[25] Neal Report ¶1.7.1 and ¶1.7.2.

[26] Neal Report, ¶3.10 and ¶3.11.

[27] Neal Report, ¶3.12.

[28] Neal Report, ¶3.13.

[29] Neal Report, ¶4.2.3 and ¶4.3.

[30] Neal Report, ¶5.5.

3254644.5

BLACK ICE STORM (Survey 4). 306 respondents reportedly participated in Survey 3 and 307 respondents reportedly participated in Survey 4.[31]

52.     The Neal association study was reportedly a test-control experiment.[32] At the outset of the interview, respondents reportedly were all shown an automobile air freshener[33]. Respondents in the test groups were reportedly shown either Defendants' BOARDWALK BREEZE product (Survey 3's test product) or its MIDNIGHT BLACK ICE STORM product (Survey 4's test product).  Respondents in the control groups were reportedly exposed to the identical stimuli with one exception.  In Survey 3, BOARDWALK BREEZE was reportedly replaced by "SEASIDE SPRAY."[34]  In Survey 4, MIDNIGHT BLACK ICE STORM was reportedly replaced by "LIGHTNING BOLT ICE STORM."[35]

53.     Respondents in both test and control groups in both surveys in the association study were then reportedly asked questions designed to elicit what brands if any come to mind.[36]

### The Neal Fame Study Diminished Plaintiffs' Marks and Consequently Biased Results Against Demonstrating Fame

54.     The Neal fame study reportedly elicited responses to unaided and aided awareness questions about "fragrances"[37] such as BLACK ICE and BAYSIDE BREEZE.  After citing aided awareness as the gold standard,[38] the Neal fame study presented respondents with a grid in which they were to indicate whether or not they recognized the fragrance name, and only the name, in

---

[31] Neal Report, Table 6, p. 22.

[32] Neal Report, ¶6.11.

[33] Neal Report, ¶6.11.

[34] Neal Report, ¶6.11.2.

[35] Neal Report, ¶6.11.2.

[36] Neal report, ¶6.15 - ¶6.19.

[37] I shall comment on Neal's use of the word "fragrances" later in this Declaration.

[38] Neal report, ¶4.2.1.

the left hand column of the grid.  However, this mode of eliciting fame diminishes Plaintiffs'
marks.

55.     I spoke above in my discussion of the Poret study about the importance of
context.  The same is true here.  Jacoby (2013) writes:

> Whether testing for genericism, secondary meaning, likely confusion,
> *fame* (emphasis added), blurring, or tarnishment, it seems well accepted
> that, because the product or item on which the mark appears may contain
> other information bearing *cues* as to its source, test stimuli should not
> separate marks from the items upon which they appear in the marketplace.
> The caution against dissembling the components of a real-world stimulus
> applies not only to marks and goods, but to tests of deceptive advertising
> or packaging as well.[39]

56.     Simply placing the name of Plaintiffs' "fragrances" in simple letters in a grid is
perhaps the ultimate form of diminishing the BLACK ICE and BAYSIDE BREEZE marks.

57.     By depriving respondents of the context in which the "fragrance" appears, the
Neal fame study made it more difficult for respondents to recognize the fragrance.  Surely, if the
study presented respondents with (say) the package with the fragrance on it, respondents would
have been more likely to (aided) recognize the product fragrance.

**The Neal Association Study Contained Confusing Questions**

58.     One of the survey criteria in the Federal Judicial Center's *Manual for Complex
Litigation* is that questions must be clear. The Neal association study contains at least one
question that would no doubt confuse respondents.  Furthermore, that question comes at a very
inconvenient place in the survey.

59.     In the association study, Dr. Neal's question Q12 reads "What brand or brands, if
any, come to mind when viewing this product?"  The three response alternatives are: no brand

---

[39] Jacoby, Jacob (2013), *Trademark Surveys: Designing, Implementing, and Evaluating Surveys,*
Chicago: American Bar Association Publishing, pp. 485-6.

comes to mind, one brand comes to mind, and more than one brand comes to mind.  The confusing nature of this question is that the question asks what brands and the response alternatives indicate how many.  The possible responses do not provide legitimate answers to the question asked.  The question as a whole does not make sense and, for that reason, would confuse respondents.  Such errors frequently have lingering effects.

60.     When respondents encounter poorly designed questions that are difficult to understand, respondent motivation to answer questions carefully and completely generally declines. Respondents tend to take shortcuts to reduce the cognitive effort used for interpreting the questions and formulating their answers. This behavior is often referred to as satisficing. According to Krosnick and Presser (2010):

> Rather than expend the effort necessary to provide optimal answers, respondents may take subtle or dramatic shortcuts. In the former case, respondents may simply be less thorough in comprehension, retrieval, judgment, and response selection. They may be less thoughtful about a question's meaning; search their memories less comprehensively; integrate retrieved information less carefully; or select a response choice less precisely.[40]

61.     Possible reactions to this situation include skipping steps in the response process, omitting questions, or even making up answers.[41]  In short, once a respondent encounters Q12, s/he will not take the remainder of the survey as seriously as s/he would have otherwise.  As such, a respondent's answer to the subsequent question, Q13 or Q14, would be contaminated and, as such, cannot be relied upon to reach any conclusions about mental association of two brands or the likelihood of dilution.

---

[40] Krosnick, Jon A., and Presser, Stanley., "Question and Questionnaire Design," in *Handbook of Survey Research*, Second Edition, Marsden, P., and Wright, J. (Eds.), Emerald Group Publishing Limited, 2010,  p. 265 (emphasis added).

[41] Dillman Don A., Jolene D. Smyth, and Lisa Melani Christian (2014), *Internet, Phone, Mail and Mixed-Mode Surveys: The Tailored Design Method,* New York: John Wiley & Sons, Inc.,p. 107.

3254644.5

**Questions in Both Neal Studies Used Ambiguous Language**

62.    Survey questions need not only be clear, they must also be precise. Even questions that appear clear can convey ambiguities to some respondents.[42] Reliable survey research requires that each respondent understand the questions and that the understanding is uniform across respondents. It is well established in the survey literature that ambiguous questions "written with … words with various different meanings [are] … more difficult for respondents to interpret."[43] For example, in *The Art of Asking Questions*, Payne states, "[s]urvey questions ideally should be geared to embrace all levels of understanding so that they have the same meaning for everyone."[44] He adds: "The most critical need for attention to [survey] wording is to make sure that the particular issue which the questioner has in mind is the particular issue on which the respondent gives his answers."[45]

63.    When faced with survey questions that are ambiguous or hard to interpret, prior literature has documented evidence that respondents tend to take shortcuts to reduce the cognitive effort used for interpreting the questions and formulating their answers. Specifically, respondents may reduce the cognitive effort necessary for generating answers by employing "cues in the question itself to identify a response that seems easily defensible."[46] This is another form of the satisficing described in the previous section.

---

[42] Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, 2011, p. 248.

[43] Krosnick J., "Response Strategies for Coping with the Cognitive Demands for Attitude Measures in Survey," *Applied Cognitive Psychology*, John Wiley & Sons Ltd., 1991, p. 221.

[44] Payne, Stanley L., *The Art of Asking Question,* Princeton University Press, 1951, p.115.

[45] Payne, Stanley L., *The Art of Asking Question,* Princeton University Press, 1951, p.9.

[46] Krosnick, Jon A., et al., "Satisficing in Surveys: Initial Evidence" Braverman, M.T., and Slater, J.K. (Eds.), *Advances in Survey Research*, Jossey-Bass, 1996, p. 31.

3254644.5

64.     The ambiguity in the Neal studies involves the words "brand" and "fragrance." Although each can serve as a source identifier, brand and fragrance are clearly two different things.

65.     The questions in the Neal association study explicitly ask about "brands."  At the same time, the questions in the Neal fame study explicitly ask about "fragrances."  In each case, target answers are Plaintiffs' marks at issue in this case.  Yet there is an inconsistency.  BLACK ICE and BAYSIDE BREEZE are fragrances for the purposes of the fame study, yet they are brands for the purposes of the association study.

66.     It appears that Dr. Neal himself is not sure whether Plaintiffs' marks indicate a brand or a fragrance.  His confusion is evidenced in the version of Q8 written in the text of his report.[47] It says,

> In the space below, please write down the names of all air freshener *fragrances* (emphasis added) for automobiles that you can think of.  Please write each *brand* (emphasis added) in a separate box below.

If Dr. Neal is not sure what Plaintiffs' marks are, how can he possibly expect respondents to be? Given that, it is difficult to tell how respondents interpreted the questions they were being asked. Without clarity on and assured consistency of that interpretation, the data collected from respondents in the Neal studies cannot be relied upon.

**The Neal Studies Suffer From Unreliable Record-Keeping, Data Collection and Reporting**

67.     In addition to the problems with the Neal studies discussed above, the Neal studies suffer from unreliable record-keeping, data collection, and reporting.

---

[47] Neal Report, 3.10.  The version of Q8 written here differs from that in the questionnaires in the report's exhibits, as discussed further *infra*.

68.     As noted above, Dr. Neal's report states that in Q8 of his "fame" survey, respondents were asked:

> In the space below, please write down the names of all air freshener *fragrances* for automobiles that you can think of.  Please write each *brand* in a separate box.[48]  (Emphasis added).

69.     However, in the survey questionnaire attached to his report, the second sentence of this same Q8 states: "Please write each *name* in a separate box below."[49]  (Emphasis added).  This is a discrepancy between Dr. Neal's report of his survey, and the survey questionnaire that he provided with his report.

70.     Similarly, Dr. Neal's report states that in Q9 of his "fame" survey, respondents were asked:

> "Do any other *names brands* of air freshener fragrances for automobiles come to mind?  If so, please write the names below.  Please write each name in a separate box below."[50]  (Emphasis added).

71.     However, in the survey questionnaire attached to his report, the first sentence of this same Q9 states: "Do any other names of air freshener fragrances for automobiles come to mind."[51]  (Emphasis added).   This is another discrepancy between Dr. Neal's report of his survey, and the survey questionnaire that he provided with his report.

72.     Upon receiving Dr. Neal's report, Plaintiffs requested that Dr. Neal produce a live link allowing us access to each survey discussed in his report, or an equivalent digital representation of each survey discussed in his report.  Unlike Mr. Poret, Dr. Neal did not produce a live link or any equivalent.  At his deposition, he testified that no live link was available.

---

[48] Neal Report, 3.10.

[49] Neal Report, Exhibit A-1.

[50] Neal Report, 3.11.

[51] Neal Report, Exhibit A-1.

3254644.5

73.    Dr. Neal's failure to maintain a live link of his survey makes it impossible to examine and verify how the survey actually operated, or to resolve the discrepancies between his report and his questionnaire as to what respondents were asked.

74.    There are also discrepancies between the survey data sets that Dr. Neal has produced.  As discussed above, Q12 of Dr. Neal's "association" survey asked respondents: "What brand or brands, if any, come to mind when viewing this product?"  The three response alternatives were: "no brand comes to mind," "one brand comes to mind," and "more than one brand comes to mind."

75.    In the first data set we received from Dr. Neal, respondents' answers to this question were all coded as "1" or "2" or "3."  But in a subsequent data set, at least 64 of those same respondents' answers to this question were coded as "4" or "5."

76.    Dr. Neal has stated that '[t]his coding discrepancy was caused by a back-end programming error in Qualtrics (the survey platform used for the survey)." In other words, Dr. Neal's online survey provider failed to follow the coding instructions in one of his questionnaires.  Whether Qualtrics correctly implemented the rest of Dr. Neal's questionnaires cannot be determined, because Dr. Neal did not preserve a live link of his surveys.

77.    Dr. Neal has since stated that he manually "corrected" this coding error when providing his first data set, but "simply forgot" to correct it again when he provided the supplemental data set.[52]   In other words, Dr. Neal changed the survey data he received from Qualtrics before he produced it to Plaintiffs the first time, but forgot to do so the second time. Furthermore, Dr. Neal does not provide respondent ID numbers, and the rows of the first data set

---

[52] Declaration of Dr. David Neal, executed on November 9, 2018.

3254644.5

and the supplemental data set do not appear to be presented in the same order. This makes it virtually impossible to verify Dr. Neal's explanation of the differences between the two data sets.

78.    This coding discrepancy, and Dr. Neal's explanation, cast further doubt on the accuracy of the data collection and reporting of his survey results in this Action.

79.    For these reasons as well, Dr. Neal's work in this Action is unreliable.

## CONCLUSION

80.    It is my opinion that the aspects of the Poret and Neal studies and reports discussed above, separately and together, invalidate the studies presented in the Poret and Neal reports. As such, their conclusions cannot be relied upon with any degree of scientific certainty.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on December 10, 2018

Joel H. Steckel, Ph.D.

22

3254644.5