**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CAR FRESHNER CORPORATION, and
JULIUS SAMANN LTD.,

                     Plaintiffs,

        v.                                            5:17-cv-171
                                                 (TJM/ATB)

AMERICAN COVERS, LLC, f/k/a American Covers,
Inc., d/b/a Handstands, ENERGIZER HOLDINGS,
INC., and ENERGIZER BRANDS, LLC,

                     Defendants.

_____

**Thomas J. McAvoy, Sr. U.S.D.J.**

**DECISION & ORDER**

      Before the Court is Defendants' motion for summary judgment in this case alleging

trademark infringement and dilution under state and federal law.  <u>See</u> dkt. # 84.  The

parties have briefed the issues and the Court will consider the parties' positions without

oral argument.

## I.     BACKGROUND[1]

      This case concerns allegations by Plaintiffs Car-Freshner Corporation and Julius

Samann, Ltd., ("Plaintiffs"), that Defendants American Covers, LLC, f/k/a American

Covers, Inc., d/b/a Handstands, Energizer Holdings, Inc. and Energizer Brands, LLC,

_____

[1]Defendants filed the Statement of Material Facts with citations to the record
required by Local Rule 7.1(3) and Plaintiff filed a response.  <u>See</u> L.R. 7.1(3).  The Court
will cite to the Defendants' Statement for facts which are uncontested and note
disagreements between the parties with reference to both parties' statements.

1

("Defendants") violated the Plaintiffs' rights in trademarked scent names for automotive air freshener products. Plaintiffs distribute automotive air freshener products under the "Little Trees" label. Defendants engage in the same business using the "Refresh Your Car!" brand, as well as other labels. Plaintiffs contend that Defendants sold "Refresh Your Car!" products with scent names confusingly similar to two of Plaintiffs' "Little Trees" products, "Black Ice" and "Bayside Breeze." Plaintiff contends that Defendants' product names, "Midnight Black/Ice Storm" and "Boardwalk Breeze" misled consumers into believing that Car-Freshner was the source of those goods and diluted the unique market value of Plaintiffs' scent names. After Plaintiffs filed an Amended Complaint and the parties engaged in discovery, Defendants filed the instant motion for summary judgment.

In July 2016, Defendants Energizer Holdings, Inc., and Energizer Brands, LLC, acquired Defendant American Covers, LLC ("Handstands"). Defendants' Statement of Material Facts ("Defendants' Statement"), dkt. # 93-1, at ¶ 1. Handstands sold automotive air freshener and appearance products under a variety of brand names, including Refresh Your Car!, California Scents, Driven, Bahama & Co., Lexol, and Eagle One. Id. The parties dispute the degree to which these brands had achieve widespread recognition in the relevant market segments. Compare Defendants' Statement at ¶ 1 with Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's Response") at ¶ 1. Refresh Your Car! air fresheners have been available since 2006. Defendants' Statement at ¶ 2. The parties dispute Refresh Your Car!'s success; Defendants point to millions in annual sales, while Plaintiff provides evidence that indicates that other companies have larger sales of similar products. See Defendants' Statement at ¶¶ 2-3, Plaintiffs' Response at ¶¶ 2-3.

2

In December 2017 Energizer began selling retailers and distributors two new Refresh Your Car products. Defendants' Statement at ¶ 5. The first product was a line of dual-scented air fresheners that used the scent names "Midnight Black" and "Ice Storm." Id. The second product was a line of vent stick air fresheners bearing the name "Boardwalk Breeze." Id. Retailers and distributors began selling these products in January 2017. Id. at ¶¶ 6-7.

The parties disagree about whether Handstands made the decision to use the names "Midnight Black" and "Ice Storm" in the same package in early 2016, or after Energizer acquired the company. Compare Defendants' Statement at ¶ 8, Plaintiffs' Response at ¶ 8. Plaintiffs point to the statement of Handstand's former CEO, who testified that "the conception of it was during my time. The go/no go and subsequent launch would have occurred after I separated from the company." Plaintiffs' Response at ¶ 8. In any case, the Court notes, the Defendants acknowledge that–whoever conceived of the product–the products entered the marketplace after Energizer acquired Handstands.

Energizer sold its "Midnight Black/Ice Storm" dual-scented products in a variety of forms. Defendants' Statement at ¶ 9. Among those products were four- and six-pack vent sticks, diffusers, mini diffusers, and gel cans.[2] Id. Defendants offered the "Boardwalk Breeze" scent only in the form of a four-pack of vent sticks. Id. at ¶ 10.

Plaintiffs use "Black Ice" as a scent name for a line of air fresheners the company sells. Id. at ¶ 13. Plaintiffs' packaging for this product, sold under the "Little Trees" brand,

---

[2]Plaintiffs point out that Defendants also offered an "oil wick" product in that dual scent. Plaintiffs' Statement at ¶ 9.

3

includes a yellow background, green pine tree logo, and "little trees" logo, along with a logo for the name of the particular scent. Id. at ¶¶ 13, 13(a). Plaintiff offers the "Black Ice" scent in a variety of formats, including paper[3], vent wrap[4], "fresh link[5]," can, pump, and, after Plaintiffs filed their lawsuit in this matter, a "fiber can."[6] Id. at ¶¶ 13(a-e), 15. Plaintiffs add that they also sold Black Ice in the "vent clip+s" format.[7]

Plaintiffs filed their Complaint in this Court alleging trademark infringement, trademark dilution, and unfair competition, on February 16, 2017. See dkt. # 1. The Complaint addressed infringement and dilution only with respect to Plaintiff's "Black Ice" mark. Id. Defendants' counsel notified Plaintiffs' in-house counsel on March 31, 2017[8] that Defendants had decided to stop selling the Midnight Black and Ice Storm dual scent product. Defendants' Statement at ¶ 16. Counsel also informed Plaintiffs that a "sell-off" period would end no later than June 30, 2017. Id. Plaintiffs never agreed to a sell-off period. Plaintiffs' Response at ¶ 17. Plaintiffs filed an Amended Complaint alleging infringement and dilution of both the "Black Ice" and "Bayside Breeze" marks on April 11,

---

[3]This format is probably familiar to most readers. It consists of a pine-tree shaped paper device with string tied to a hole at the top of the tree. Users typically hang such fresheners from their rear-view mirrors.

[4]This small plastic device wraps around one of the slats on a car's vents.

[5]This device, shaped like a teardrop, can be hung from the rear-view mirror.

[6]Meant to be placed under the seat, the user of the fiber can twists the lid to release the freshener's scent.

[7]This is a larger version of the vent wrap, covering more of the vent.

[8]Defendants' statement gives this date as March 31, 2018, but the context of the statement makes clear that March 31, 2017 is the proper date.

2017, after Defendants informed Plaintiff that they had decided to stop selling Midnight

Black and Ice Storm together.  Defendants' Statement at ¶¶ 17-18; see dkt. # 13.

Plaintiffs use "Bayside Breeze" as a scent name in a variety of air fresheners.

Defendants' Statement at ¶ 19.  These products use a yellow background, the tree design

mark and the Little Trees logo.  Id.  These products include hanging paper trees, vent

wraps, and fresh links.  Id. at ¶ 19(a-c).  Plaintiffs began using the "Bayside Breeze" scent

in 2013.  Id. at ¶ 21.  On May 5, 2017[9], after Plaintiffs filed their Amended Complaint,

Defendants' counsel notified Plaintiffs' counsel that Defendants had decided to stop

selling its allegedly infringing "Boardwalk Breeze" product, and that a United States "sell-

off" period would end no later than June 30, 2017.  Id. at ¶ 22.  Defendants decided to

stop selling the "Boardwalk Breeze" product due to poor sales.[10]  Id. at ¶ 23.  The parties

disagree about exactly when Defendants stopped selling the two scents.  Defendants

claim that they had ceased selling both products by June 30, 2017.  Defendants'

Statement at ¶ 24.  Plaintiffs contend that Defendants delivered some "Midnight Black/Ice

---

[9]The Court assumes that the date listed for this notification, May 5, 2018, is in error from the context and that May 5, 2017 is the appropriate date.

[10]The parties dispute exactly when Energizer made the decision to discontinue Boardwalk Breeze.  Defendants' statement of facts alleges that "[e]ven before the Amended Complaint was filed, Energizer already had decided to stop selling Boardwalk Breeze due to lack of sales."  Defendants' Statement at ¶ 23.  The portion of the deposition used to support this claim, however, does not mention the date on which Energizer made that decision (that deposition is subject to a confidentiality order and the Court will not quote the source here).  Plaintiffs cite to an earlier page in the same deposition that fails to provide an exact date for the decision to stop selling the product, and the testimony could best be read to say that the decision came around the time that Plaintiffs filed their amended complaint.  See Plaintiffs' Response at ¶ 23.  The Court finds that a question of fact exists as to the exact date that Defendants decided to stop selling the Boardwalk Breeze product.

Storm" products to AutoZone after that date, and that some of those products might have been "miscoded" and sold in the United States. Plaintiffs' Response at ¶ 24. Plaintiffs deny Defendants' claim that Energizer "quarantined" and "blocked" the products to prevent sales after June 30, 2017 for the same reason. Compare Defendants' Statement at ¶¶ 25-26; Plaintiffs' Response at ¶¶ 25-26.

Defendants replaced the Midnight Black/Ice Storm dual scent product with a nearly identical product. Defendants' Statement at ¶ 27. The only difference between the new and old vent sticks product was the name: "Lighting Bolt/Ice Storm" replaced "Midnight Black/Ice Storm." Id. Plaintiffs do not complain that the Lightning Bolt/Ice Storm" products violate their trademark rights. Id. at ¶ 28. Defendants sold single-scent products using the name "Midnight Black" before the Plaintiffs filed their Complaint and after; Plaintiffs have not complained of infringement. Id. at ¶ 30.

Plaintiffs have filed dozens of lawsuits alleging infringement of their distinctive tree-shaped design, either in the form of similar paper air fresheners, or in product packaging that incorporated the tree and "Little Tree" marks. Id. at ¶ 31. Plaintiffs have also filed complaints alleging a violation of their distinctive trade dress–yellow product packaging showing the Little Trees brand name diagonally across the top and the Tree Design mark in the corner as a logo. Id. at ¶ 32. Plaintiffs use this packaging, logo, and brand name on the products here in question. Id. at ¶ 33. In responding to Defendants' statement, Plaintiffs contend that the term "yellow packaging" is ambiguous. Defendants' Statement at ¶ 33.

The parties disagree about how recognizable Plaintiffs' trade dress is for consumers. Defendants claim that the Plaintiffs' witnesses testified that consumers

recognize the Little Trees products "instantly" because of the packaging, but Plaintiffs contend that those witnesses testified more equivocally, asserting that the aim of the trade dress was to make the products recognizable "instantly," but that the buying decisions relate more to fragrance than anything else. Compare Defendants' Statement at ¶ 34; Plaintiffs' Response at ¶ 34.

Most of Plaintiffs' freshener sales are in the paper format. Defendants' Statement at ¶ 35. Defendants did not offer any of the items in question in paper format. Id. at ¶ 36. Defendants sold an Ice Storm fragrance in a variety of formats for eight years before this dispute arose. Id. at ¶¶ 37-38. Defendants have also used the name "Arctic Ice," "Black Out," and "Ice." Id. at ¶¶ 39-44. Likewise, Defendants have sold and continue to sell a number of products that use "Breeze" as a scent name, including "Cool Breeze," "Summer Breeze," "Laguna Breeze," "Tropical Breeze," and "Aruba Blue Breeze." Id. at ¶¶ 45-46. Plaintiffs have never complained about any of these products. Id. at ¶ 47. Third parties have registered and/or used a number of air-freshener-related marks that use "Black" or "Ice" in their names. Id. at ¶¶ 53-54. Third parties have also registered and/or used a number of scent names that incorporate the word "Breeze." Id. at ¶ 55. Defendants contend that Plaintiffs have not objected to these uses, though Plaintiffs point to deposition testimony that indicates that Defendants objected to at least one such use. Id. at ¶ 56; Plaintiffs' Response at ¶ 56. Plaintiffs admit that third parties have used "black ice" or some variant thereof 103 times, but point out that Plaintiffs have often been successful in efforts to stop such uses. Compare Defendants' Statement at ¶ 57 and Plaintiffs' Response at ¶ 57. Third-parties have registered "Black Ice" trademarks for a number of other non-air-freshener products. Defendants' Statement at ¶ 58. A number of

third parties have also applied for use-based trademarks for "Black Ice" in a number of other products. Id. at ¶ 59. Plaintiffs point out that one of those applications was abandoned. Plaintiffs' Response at ¶ 59.

Retail stores tend to display automotive air fresheners from different brands in a large group. See Defendants Statement at ¶ 105 and the photographs therein. Stores group the items either by brand or by type of product and then group that type of product by brand. Id. Items that are contained in cans or bottles are usually grouped together at the bottom of the larger display. Id. Plaintiffs dispute this statement, pointing out that no proof exists that the photographs in question were actually taken in stores. Plaintiffs' Response at ¶ 105. Plaintiffs also point to evidence that shows stores have displayed the parties' products next to each other in such displays. Id.

The parties dispute whether Plaintiffs have produced evidence of actual confusion in this case. Defendants deny they have, but Plaintiffs point to a comment by a visitor to an Amazon.com page who asked if "the can of Midnight Black," Defendants' product, was "the same as the spray, and the hanging trees?" Plaintiffs' Response at ¶ 107. While Plaintiffs offer no survey evidence to show a likelihood of confusion about the source of the goods, Defendants point to a survey they commissioned which purports to demonstrate a small likelihood of confusion between the parties' products. Defendants' Statement at ¶¶ 108-110. Plaintiffs dispute both the value and admissibility of this evidence, and have filed a motion to preclude the testimony. Plaintiffs' Response at ¶¶ 109-110.

In bringing their products to market, Handstands employees considered scent

trends.  Defendants' Statement at ¶ 111.[11]  These employees reviewed material from third-party vendors, finding that "masculine scents and tropical scents were a place for growth." Id.  Plaintiff points to e-mails between company officials, which indicated that executives, who included the company's CEO, Vice President for Product Development, Vice President of Sales, and Director of Category Management had discussed new fragrances and decided that they would be "Peach, Coconut, Boardwalk Breeze, and a Black Ice variant."  Plaintiffs' Response at ¶ 111.  While predicting that the company would "nail the fragrance to a "T," the executive wondered "how close we want to get as well to the concept?  For example, do we want to use the words 'Ice' or 'black' in the name?"  Id. Another executive responded that "In my opinion, we get as close to the Black Ice name as we can, without running into legal issues.  We want customers to immediately make the connection."  Id.  Another proposed "a name like 'Midnight Black'" or "If we really wanted to have some fun, we could also look at a dual with a Black Ice variant–along the lines of Midnight Black/Ice Storm."  Id.  A different manager admitted that the "Boardwalk Breeze" scent may have been designed to draw a connection between that scent and Plaintiffs' "Bayside Breeze."  Id.  "Our intent," the manager stated, "has always been to draw close to Bayside Breeze in fragrance and concept.  Obviously we don't want to tell our customers this, but this is the reason for the name."  Id.  Indeed, Plaintiffs point out, the packaging for "Boardwalk Breeze" does not contain a boardwalk, but it does have a sailboat, like Plaintiffs' product.  Id.  The parties dispute the implications of all of these statements.

---

[11]Defendants describe this process as one of "research."  Defendants' Statement at ¶ 111.  Plaintiffs dispute that claim, contending that Handstands employees "simply intended to trade upon the success of BLACK ICE and BAYSIDE BREEZE."  Id.

9

Compare Defendants' Statement at ¶¶ 112-117 to Plaintiffs' Response at ¶¶ 112-117. They also dispute whether Handstands' desire to avoid a lawsuit regarding the scents in question represents a sincere effort or an expression of a desire to infringe without being caught. Defendants' Statement at ¶¶ 118-19; Plaintiffs' Response at ¶¶ 118-119. They also dispute whether Handstands sought to differentiate between the parties' products or find a way to confuse consumers as to the source. Defendants' Statement at ¶¶ 120-122; Plaintiffs' Response at ¶¶ 120-122.

Defendants have provided the results of a survey they claim indicates that "Bayside Breeze" and "Black Ice" are not well-known as source designations of air fresheners. Defendants' Statement at ¶¶ 124-128. Plaintiffs dispute both the reliability and admissibility of this report. Plaintiffs' Response at ¶¶ 124-128. The parties also dispute the scope, duration, reach, or success of Plaintiffs' advertising of the scents in question. Defendants' Statement at ¶¶ 129-130. Plaintiffs represent that they advertise the product in various places, including their web site, nationally distributed product catalogs, trade shows, and through coupons and promotions at retailers. Plaintiffs' Response at ¶¶ 129-130 (citing sealed portions of the Declaration of Elizabeth Perry, dkt. # 117-39). Defendants are correct, however, that the record evidence Plaintiffs cite does not include specific information about expenditures for advertising. Indeed, Plaintiffs admit that they "do not track advertising expenditures by scent name." Id. at ¶ 131. The parties dispute that Black Ice and Boardwalk Breeze have recognition outside the larger Little Trees brand and presentation. Compare Defenants' Statement at ¶ 133 to Plaintiffs' Statement at ¶ 133. Plaintiffs point to the presence of the Black Ice Scent in various films, television shows, music videos, and various sites on the internet to argue that the scent is famous.

Plaintiffs' Response at ¶ 133.  They also point out that the Bayside Breeze mark has appeared on social media and in an episode of HBO's "High Maintenance."  Id.

## II.     LEGAL STANDARD

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  A court must "read the pleadings of a *pro se*

plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'"

McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14

F.3d 787, 790 (2d Cir. 1994)).

## III.   ANALYSIS

Defendants seek summary judgment on each of Plaintiffs' claims.  The Court will

address them in turn.

### A.   Trademark Infringement

Defendants first contend that Plaintiffs have not produced evidence sufficient to

support a trademark infringement claim.  "'A claim of trademark infringement . . . is

analyzed under [a] familiar two-prong test[.] . . . The test looks first to whether the plaintiff's

mark is entitled to protection, and second to whether [the] defendant's use of the mark is

likely to cause consumers confusion as to the origin or sponsorship of the defendant's

goods.'"  Savin Corp. v. Savin Group, 391 F.3d 439, 456 (2d Cir. 2004) (quoting Virgin

Enters., Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003)).  "To support a finding of

infringement, a plaintiff must show a probability, not just a possibility of confusion."  N.Y.

Stock Exch. Inc. v. N.Y. Hotel, LLC, 293 F.3d 550, 554 (2d Cir. 2002).  "Confusion exists

where there is a 'likelihood that an appreciable number of ordinarily prudent purchasers

are likely to be misled, or indeed simply confused, as to the source of the goods in

question.'"  Id. (quoting Mushroom Makers, Inc. v. R.B. Barry corp., 580 F.2d 44, 47 (2d

Cir. 1978)).  "There can also be confusion where customers are likely to believe that the

challenged use of a trademark is somehow sponsored, endorsed, or authorized by its

owner."  Id. at 555.  In the Second Circuit, likelihood of confusion is determined by the

multi-factor test set out in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). Those factors include: "the strength of the senior user's mark; the similarity of the parties' marks; the proximity of the parties' area of commerce; the likelihood that the senior user will bridge the gap separating their areas of activity; the existence of actual consumer confusion; whether the junior user acted in bad faith or was otherwise reprehensible in adopting the mark; the quality of the junior user's product; and the sophistication of the relevant consumer group." Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 38 (2d Cir. 2016).

"Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." Playtex Prods. v. Georgia Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004). In this balancing, "district courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins." Id. The court's "focus" should be "'on the ultimate question of whether consumers are likely to be confused.'" Id. (quoting Paddington Corp. v. Attiki Imps. & Distribs., Inc., 996 F.2d 577, 584 (2d Cir. 1993)). Though not every case requires a detailed recitation and analysis of every Polaroid factor, "it is 'incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why.'" Natural Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576 (2d Cir. 2005) (quoting New Kayak Pool Corp. v. R & P Pools, Inc., 246 F.3d 183, 185 (2d Cir. 2001)). "[S]ummary judgment in a trademark action may be appropriate . . . where the undisputed evidence would lead to only one conclusion as to whether confusion is likely." Cadbury Bevs., Inc. v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996). Still, "[i]f a factual inference must be drawn to arrive at a

13

particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." Id.

The parties address the infringement claims with respect to the Polaroid factors. Court will address Plaintiffs' infringement claims with reference to them as well.

### i.    Strength of the Senior User's Mark

The first factor for the Court to consider is the strength of the Plaintiffs' "Black Ice" and "Bayside Breeze" marks.  In evaluating the strength of the mark, "the inquiry focuses on 'the distinctiveness of the mark, or more precisely, its tendency to identify the goods' as coming from a particular source." Lang v. Retirement Living Pub'g Co., 949 F.2d 576, 581 (2d Cir. 1991) (quoting McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1131 (2d Cir. 1979)).  "Ultimately, the strength of the mark turns on its 'origin-indicating' quality, in the eyes of the purchasing public,' so that in a given case whether the mark has acquired 'secondary meaning is a matter which may be relevant and probative and hence useful in determining the likelihood of confusion.'" Id. (quoting McGregor-Doninger, 599 F.2d at 1131).  Courts can look at two different types of distinctiveness: "'inherent distinctiveness' and 'acquired distinctiveness.'" Playtex Prods. v. Georgia-Pacific Corp., 390 F.3d 158, 163 (2d Cir. 2004) (quoting Virgin Enters. Ltd., v. Nawab, 335 F.3d 141, 147 (2d Cir. 2003)). A scale exists for inherent distinctiveness "from least to most distinctive," describes "marks that are: '(1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.'" Id. (quoting TCPIP Holding Co., Inc. v. Haar Communications, Inc., 244 F.3d 88, 93 (2d Cir. 2001)).  "Acquired distinctiveness . . . refers to the 'recognition plaintiff's mark has earned

in the marketplace as designators of plaintiff's goods and services.'" Id. (quoting

Brennan's, Inc. v. Brennan's Rest, L.L.C., 360 F.3d 125, 131 (2d Cir. 2004)). "When there

is widespread recognition of a mark among consumers, there is an increased likelihood

that 'consumers will assume it identifies the previously familiar user,' and therefore an

'increased . . . likelihood of consumer confusion if the new user is in fact not related to the

first.'" Id. (quoting Virgin, 335 F.3d at 148). "[A] mark's strength is examined principally in

the market in which the mark is used. Hence defining the relevant market becomes an

important aspect of the infringement analysis." Morningside Group, Ltd. v. Morningside

Captial Group, LLC, 182 F.3d 133, 139 (2d Cir. 1999). "[R]egistered trademarks are

presumed to be distinctive and should be afforded the utmost protection." Lois

Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986).

Defendants argue that Plaintiffs' marks are weak. They point to a large number of

fragrances that use the names "black," "ice," or "breeze." This abundance of usage for

such terms, Defendants claim, make Plaintiffs' marks "exceedingly weak." Plaintiffs

respond that the record reveals that Plaintiffs' marks are strong. The marks are

registered, and two of those registrations for "Black Ice" are incontestable. Moreover, the

marks are arbitrary–they do not communicate any information about the product directly or

by suggestion–and this enhances their strength. The strong sales of both products also

indicates strength, as do Defendants' efforts to trade on their popularity. Plaintiffs also

point to numerous appearances of the "Black Ice" scent in popular culture as evidence of

the mark's strength. While many scents use the words "ice" and "breeze," the ability of the

marks to remain distinctive in that crowded field indicates strength. Defendants do not

dispute that the marks are registered and argue that the Court should not consider

whether the marks are arbitrary because that question is a disputed fact not properly

before the Court.[12] They also point out that protectability is not alone sufficient to find a

---

[12]Defendants argue that Plaintiffs violated Local Rule 7.1(a)(3) in responding to their statement of material facts. Plaintiffs' response, they contend is "are rife with allegations of additional material facts." Defendants claim Plaintiffs were required to set forth such "additional" facts in separate numbered paragraphs, and that the Court is not permitted to consider such facts because of those alleged failings. The Local Rule in question provides in relevant part that:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, a short andconcise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.

> . . .

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response **may** also set forth a short and concise statement of any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is established.

L.R. 7.1(a)(3)(emphasis added). Apparently, Defendants' complaint is that Plaintiffs failed to set out additional facts in separate numbered paragraphs, and that any responses that attempt to point to additional factual issues from those stated in Defendants' filing should be ignored. As explained above, the Local Rules provide that the opposing party *may* respond to the statement of material facts by appending to the party's response additional numbered paragraphs citing to the record. Plaintiffs responded to Defendants' statement by citing to the record to dispute facts claimed undisputed by the Defendants. The Court examined both parties' statements closely, noting where the facts were undisputed, and evaluating the portions of the record cited by the parties when they claimed a dispute. The parties' statements therefore served their purpose: to point the Court where disputes

mark strong.  Defendants also contend that no evidence supports a claim that the two

scents in question had large sales as a result of their scent names rather than their

association with Plaintiffs' admittedly strong "Little Trees" trade dress and marks.

Here, the Court is to "evaluate the strength of" the two scents "by examining the

degree to which the words" Black Ice and Bayside Breeze "tend to identify" Plaintiffs'

"business in the public's eye."  Lang, 949 F.2d at 581.[13]  The evidence supports a

conclusion by a reasonable juror that the "Black Ice" mark is moderately strong.  The

evidence does not support the same conclusion with respect to the "Bayside Breeze"

mark.  Registration and the fairly arbitrary nature of the marks–regarding which

Defendants offer little argument–indicates some strength for both marks, but such

evidence in itself is not determinative of the issue.  Lang, 949 F.2d at 581.  Plaintiffs have

pointed out strong sales for both products, but the evidence does not indicate how the

scents–as opposed to the general packaging and brand identity of the

products–connected consumers to Little Trees as the source of the products.  Strong

─────────────────────

existed about factual issues and allow the Court to determine whether those disputes were
genuine as a matter of law.  Ignoring factual disputes pointed to by the Plaintiffs because
Plaintiffs did not opt to cite them in additional paragraphs would serve no purpose other
than to elevate (optional) form over substance.  The Court prefers to decide cases on the
merits.  Moreover, Defendants' complaint here–that Plaintiffs claim that their marks are
arbitrary is a factual issue not properly articulated in Plaintiffs' factual statement–is not
even really a pure question of fact, but one where the Court would apply the law of
trademarks to the Plaintiffs' marks to determine whether their nature is "arbitrary" or fits in
some other legal category.

[13]The parties argue about the strength of the two scent names, which is the issue
here.  If the question were whether the "Little Trees" trademark and trade dress were
strong, the evidence indicates that a reasonable juror could certainly find the marks
strong.  Indeed, the strength of those larger marks undermine any likelihood of confusion
as to the source of the goods, since the packaging and imagery connected with Plaintiffs'
products are distinct and identify the manufacturer clearly.

sales, therefore, offer only a small amount of evidence that the marks are popular, and

that small evidence supports a finding of some strength for the marks.  Plaintiffs also offer

evidence of the presence of "Black Ice" in popular culture–including films and videos and

other expressions that identify "Black Ice" specifically–and this evidence could cause a

reasonable juror  to conclude that Black Ice has some strength as a way of connecting the

public to the Plaintiffs.  Plaintiffs offer evidence only that "Bayside Breeze" appeared on-

screen in an HBO program and has been mentioned on social media.  As explained

above, Defendants have offered evidence of dozens of air fresheners that include the

words "breeze" or "ice."  Reasonable jurors could use this evidence to conclude that the

names of the Plaintiffs' scents are too widely used to identify for users the source of the

marks, and the marks are thus weak.  See Streetwise, 159 F.3d at 744 (broad "third party"

use of words in mark can weaken the strength of a particular mark).

Given this conflicting evidence, a reasonable juror could therefore find that the

Black Ice scent has some strength in "indentify[ing] goods sold under it as coming from

one particular source[.]" Streetwise Maps v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir.

1998).   The Bayside Breeze scent, however, has considerably less power in that respect.

This factor does not weigh strongly in creating a likelihood of confusion among consumers

as to the source of the goods in question for either scent.  The "Bayside Breeze" scent is

weaker in terms of its strength than the "Black Ice" scent.

### ii.    Similarity of the Parties' Marks

The similarity of the marks looks at more than the marks themselves because "'the

crux of the issue is whether the similarity is likely to cause confusion among numerous

customers who are ordinarily prudent.'" Savin, 391 F.3d at 458 (quoting Swatch Group

(U.S.) Inc. v. Movado Corp., 01 Civ. 0286, 2003 U.S. Dist. LEXIS 6015, at *11 (S.D.N.Y. Apr. 10, 2003)).  Thus, "'the setting in which a designation is used affects its appearance and colors the impression conveyed by it.'" Id. (quoting McGregor-Doniger, 599 F.2d at 1133.  "[T]he 'impression' conveyed by the setting in which the mark is used is often of critical importance.'" Id. (quoting Spring Mills, Inc. v. Utracashmere House, Ltd., 689 F.2d 1127, 1130 (2d Cir. 1987)).  The Court looks to "all factors which the buying public will likely perceive and remember" such as "the products' sizes, logos, typefaces, and package designs." W.W. W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993)).  "The fact that a trademark is always used in conjunction with a company name may be considered by the trial court as bearing on the likelihood of confusion." McGregor-Doniger, 599 F.2d at 1134.

While no one of the Polaroid factors is determinative, "in an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant summary judgment for an infringement defendant 'if the court is satisfied that the . . . marks are so dissimilar that no question of fact is presented.'" Nabisco v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (quoting Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 141 (2d Cir. 1991)).  A court should consider the "general impression conveyed by the two marks." McGregor-Doniger, 599 F.2d at 1134.  In McGregor-Doniger, where McGregor alleged that the defendant's "drizzle" line of coats had infringed on McGregor's line of "drizzler" golf jackets, the court fond that "[i]f Drizzle had chosen consistently to present its mark in red plaid lettering or to advertise its coats as the McGregor DRIZZLE line, we would be compelled to conclude that the similarity between the DRIZZLER mark and the DRIZZLE mark, [a]s generally presented to the public, had been heightened and

the likelihood of confusion had been enhanced." Id.  Noting, however, that the packaging and appearance of the marks in context remained distinct, the court concluded that "the fact that only one mark generally appears in close conjunction with the red plaid McGregor name increases the likelihood that the public, even when viewing the marks individually, will not confuse the two." Id.

Thus, "[i]n assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found[.]" Gruner + Jahr USA Publ. v. Meredith Corp., 991 F.2d 1072, 1078 (2d Cir. 1993).  Courts also "consider the totality of the factors that could cause confusion among prospective purchasers." Id.  The court is to "[take] into account all factors that potential purchasers would likely perceive and remember." Lang, 949 F.2d at 581 (2d Cir. 1991).  A court looks at "(1) whether the similarity between the two marks is likely to cause confusion, and (2) what effect the similarity has upon prospective purchasers." Strange Music, Inc. v. Strange Music, Inc., 326 F.Supp.2d 481, 490 (S.D.N.Y. 2004).  "In order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." Universal City Studios, Inc. v. Ninetendo Co., 746 F.2d 112, 117 (2d Cir. 1984).  "When similar marks are always presented in association with company names, the likelihood of confusion is reduced." Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 969 (2d Cir. 1981).

Defendants argue that the evidence indicates that the products are distinct and that confusion is not likely.  They point to a number of differences in the products in question: 1) the varied placement of the scent names on the products; 2) the prominence of the house marks "Refresh Your Car!" and "Little Trees" and Plaintiffs' use of distinctive yellow

20

packaging; 3) differences in typeface and styles between the marks; 4) differences in shape and style of packaging; 5) differences in color and imagery; and 6) differences in the type of products offered.  This lack of similarity is decisive, and the Court should grant summary judgment as a result.  Plaintiffs argue that the scent names at issue are very similar.  "Midnight Black Ice Storm" contains "Black Ice" in the middle of the mark, after all. Evidence of record indicates that even the Defendants have confused the names "Bayside Breeze" and "Boardwalk Breeze."  These similarities, Plaintiffs point out, exist in part because Defendants sought to develop products similar to Plaintiffs' marks.  If there are differences in packaging and brand names, Plaintiffs contend, those differences are questions of fact for trial and do not justify summary judgment.  Plaintiffs also argue that the differences are less important in this case, where the products compete directly in the same retail space.

   The various products at issue are reproduced below.

**a.       Plaintiffs' Black Ice (Vent Wrap)**



**b. Plaintiffs' Black Ice (Paper)**



**c. Plaintiffs' Black Ice (Fresh Link)**



**d.**     **Plaintiffs' Black Ice (Can)**



**e.** **Plaintiffs' Black Ice (Pump)**



**f.     Plaintiffs' Black Ice (Can)**



**g.      Plaintiffs' Bayside Breeze (Paper)**



**h.  Plaintiffs' Bayside Breeze (Vent Wrap)**



### i. Plaintiffs' Bayside Breeze (Fresh Link)



**j.      Defendants' Midnight Black/Ice Storm (vent sticks)**

 

**k.        Defendants' Midnight Black/Ice Storm (diffuser)**

 

**I.** **Defendants' Midnight Black/ Ice Storm (Dual Scent Can)**



**j.     Defendants' Boardwalk Breeze**



Defendants contend that these products, considered in the sum of their presentation, are not likely to cause confusion as a matter of law, and that summary judgment is therefore appropriate.

Plaintiffs are correct that the scent names themselves are similar. Defendants' products contain the phrase "Black Ice," and the word "Breeze," which are also present in Plaintiffs' offerings. By themselves, such phrases could confuse consumers about the source of the goods and thus support an infringement claim. Of course, the Court's confusion inquiry does not end with a discussion of whether the names are similar: "[r]ather, in determining whether two marks are confusingly similar, we must 'appraise the overall impression created by . . . the context in which they are found and consider the totality of actors that could cause confusion among prospective purchasers.'" Nabisco, 220 F.3d at 47 (quoting Streetwise, 159 F.3d at 744).

Here, as displayed above, the parties' products contain prominent expressions of each companies' trade names at the top of the packing, "Little Trees" for the Plaintiffs and "Refresh Your Car!" for the Defendants. On all of Plaintiffs' packing except its fiber can, the "Little Trees" trade name is written in typeface across a curved, bright red, sloping rectangle. The fiber can does not contain the "Little Trees" name in this style, but, like Plaintiffs' other packaging, the "Little Trees" name appears on a small green picture of Plaintiffs' well-known paper hanging tree product. The top of each of Plaintiffs' packaging also contains a bright yellow background where the trade name and tree logo reside. The fiber can is again different, but does contain the bright yellow coloring at the top of the product and a stylized rendering of the "Little Tree" logo on the lid. Defendants' products, by contrast, all have the "Refresh Your Car!" trade name printed at the top of the package.

"Refresh" is at the top of the trade name, written in a large, stylized typeface. The "Your

Car!" part of the name is on the next line, written in a cursive-style text. That text is next to

a white image of a small car. The names are written in blue and outlined in white. These

differences are significant, since "prominent use of [a] well-known house brand

significantly reduces, if not altogether eliminates, the likelihood that consumers will be

confused as to the source of the parties' products." <u>Nabisco</u>, 110 F.3d at 46.

 The Court must consider other factors in this analysis as well. In <u>Nabisco</u>, the

Second Circuit Court of Appeals examined the likelihood of confusion between two types

of gum, "Dentyne Ice" and "Ice Breakers." <u>Id.</u> at 47. In finding summary judgment

appropriate because no likelihood of confusion existed, the Court considered a number of

"aspects of the commercial presentation of the parties' respective marks." <u>Id.</u> The Court

considered: that "the parties present their marks in starkly different typefaces and styles,";

that, while the packages "share a generally rectangular shape, there are salient

differences in both their dimensions and overall look that result in distinctly different

commercial impressions,"; that "although both packages use blue and white colors, the

shapes and patterns of those colors are different,"; that the products were wrapped

differently; and that "the products are sold in different forms," one was a "candy-coated

pellet" and the other "a traditional stick." <u>Id.</u> These differences in presentation amounted

to "far more than a cumulation of minor differences between the parties' marks,

packaging, and product forms that does not ordinarily establish the absence of likelihood

of confusion as a matter of law." <u>Id.</u> When combined with the prominent use of a house

mark, "[t]he other significant differences between the respective packages and prodcuts

suffice to dispel completely any residual confusion." <u>Id.</u> at 47-48.

36

The Court finds this case analogous.  As the images reproduced above demonstrate, differences in packaging and presentation of the goods in question exist that, combined with the prominent use of house names in both products, dispel any likelihood of confusion as to the source of the goods in question.  Plaintiffs' "Black Ice" is presented on two lines in large white letters, over a stylized black image of an ice cube.  The "Black" on the first line is presented in all capital letters, and the "Ice" below that line has a lower case "i" a capitalized "CE."  The scent name is large and prominent on all of the packaging.  Defendants' products offer the scent names in smaller, less specialized printed type.  The type is either white or black, depending on the background for the type.  "Midnight Black" and "Ice Storm" are always separated, either as two separate two-line blocks of text, or by virtue of different backgrounds around a circular packaging.   As for the "Breeze" packages, Plaintiffs' "Bayside Breeze" is displayed at the bottom of the package on the paper product, printed on the bottom of the tree-shaped product.  On the vent wrap and fresh link products, the scent name is located either below the trade name and to the right, or at the bottom of the package and to the right.  Defendants' scent name is in the top-middle of the package, on the left.  The Plaintiffs' scent name is written in typeface in a light mint-green or blue color.  Defendants' scent name is written in cursive in white with a darker blue border.

The shape and coloring of the packaging is different too.  For products that come in similar styles, like the vent wraps, vent sticks, and Plaintiffs' hanging trees, both parties' packaging comes in a generally rectangular shape, with the shorter part of the rectangle at the top and bottom of the packaging.  On Plaintiffs' products, the bottom of the packages are all slightly rounded.  The tops of the packages are either straight across or at a curved

37

slope that rises from left to right.  Defendants' packaging is either more rounded at the bottom or fully rounded at the top and bottom.  The Plaintiffs' fiber can and Defendants' gel scent can are also shaped differently.  The Plaintiffs' can is more symetrical, while Defendants' can bulges out from top to bottom.  Plaintiffs' can also contains a stylized "Little Trees" image on the lid, while Defendants' contains the "Refresh Your Car!" name.  Plaintiffs' can has a black lid without writing, while Defendants' is grey and has writing.

The coloring of the products differs significantly as well. Plaintiffs' "Black Ice" packaging all contains bright yellows, reds, and blacks, as well as a green "Little Trees" logo.  The Defendants' products prominent colors for the "Midnight Black/Ice Storm" products are various shades of blue and black.  While some of the Defendants' products contain a sticker in black and red or a band of yellow color, even those packages are predominately blue.  None have the broad band of yellow at the top that feature in Plaintiffs' packages.  While the coloring of "Bayside Breeze" and "Boardwalk Breeze" are more similar, significant differences exist.  The blue in Plaintiffs' packaging has much more green in it.  More important, Plaintiffs' packaging contains the distinctive bright yellow that Little Trees uses, as well as red and bright green. Defendants' product lacks this feature.

The wrapping is somewhat similar, though none of Defendants' products are contained in a cellophane bag, as Plaintiffs' paper products are.  Plaintiffs' vent wrap is not visible in the packaging, while all of Plaintiffs' vent products are visible underneath plastic protection.  Packaging for Plaintiffs' fresh links is somewhat similar to the vent sticks, with those products visible under plastic.  The products themselves, however, are shaped like teardrops, while the Defendants' similarly packaged products are rectangular.

In addition, the air freshener products with the allegedly offending names are sold

in a variety of forms.  Defendants do not sell the most familiar of Plaintiffs' products–the hanging trees–in either of the allegedly offending scents.  While both parties offer products to be affixed to vents, the presentation of those devices are different.  Plaintiff offers neither the sticks nor the diffusers that Defendants does in these scents.  Plaintiffs also offer sprays and pumps that Defendants do not.

The Court finds that these differences, when combined with the prominent use of house brand names, establishes as a matter of law that "[t]he cumulative effect of the differences between the parties' products and in commercial presentation of their marks creates distinct market impressions."  Nabisco, 220 F.3d at 47.  These differences establish, as a matter of law, that no likelihood of confusion as to the source of the goods exists in this case.  Id.

The Court could on this basis alone determine that summary judgment on the infringement claim is appropriate for the Defendants.  See Nabisco, 220 F.3d at 48 ("Having determined that the parties' use of their DENTYNE ICE and ICE BREAKERS marks is so dissimilar as to require judgment for [Defendant], we need not examine the remaining Polaroid factors[.]").  In the interest of completeness, however, the Court will address those additional factors.

### iii.    Proximity

In terms of the products' proximity courts "'consider whether the products compete with each other.'" Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996) (quoting WWW. Pharm., 985 F.2d at 573).  Just because "products . . . share the same channel of trade" does not "necessarily" make them "proximate."  Id.

39

Here, the evidence explained above makes clear that the products in question compete with each other.  The evidence demonstrates that the products sell in the same places and offer the same solution to consumers' problems: they promise to improve the smell of users' cars.  Evidence provided by both sides show that retailers sell automotive air fresheners in large displays that place the products of different makers in close proximity.  This factor weighs in favor of finding a likelihood of confusion.

### iv.    "Bridging the Gap"

The "bridging-the-gap" factor examines "the likelihood that [defendant] will enter [plaintiff's] market."  Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995).  Showing no present plan to enter the market "indicates that such expansion is less, rather than more, probable," but "the absence of present intent to bridge the gap is not determinative.  In a given case, sufficient likelihood of confusion may be established although the likelihood of bridging the gap is not demonstrated.  Because consumer confusion is the key, the assumptions of the local consumer, whether or not they match reality, must be taken into account."  Id.

This factor is irrelevant, as the parties are already operating in the same market. See Streetwise, 159 F.3d at 743 ("Since plaintiff and defendants already occupy the same market of simplified, laminated street maps, the gap has been bridged.").

### v.    Actual Confusion

"[E]vidence of *actual* consumer confusion is particularly relevant to a trademark infringement action."  Streetwise Maps, 159 F.3d at 745 (emphasis in original).  That type of confusion is one "that enables a seller to pass 'off his goods as the goods of another.'"

<u>W.W.W. Pharm.</u>, 984 F.2d at 574 (quoting <u>Programmed Tax Systems, Inc. v. Raytheon</u> <u>Co.</u>, 439 F.Supp. 1128, 1132 (S.D.N.Y. 1977)).  A lack of actual confusion "may often weigh against a finding of a likelihood of confusion."  <u>Orient Express Trading Co. v.</u> <u>Federated Dep't Stores, Inc.</u>, 842 F.2d 650, 654 (2d Cir. 1988).  At the same time, "[e]vidence of *actual* confusion is not required to prove the likelihood of confusion between the two marks."  <u>Centaur Communs., Ltd. v. A/S/M Communs., Inc.</u>, 830 F.2d 1217, 1227 (2d Cir. 1987) (emphasis in original).  A party might use survey evidence to address the existence of consumer confusion.  "To be probative, a survey must 'have been fairly prepared and its results directed to the relevant issues.'"  <u>Sterling Drug , Inc. v. Bayer AG</u>, 14 F.3d 733, 741 (2d Cir. 1994) (quoting <u>Universal City Studios, Inc. v. Nintendo Co., Ltd.</u>, 746 F.2d 112, 118 (2d cir. 1984)).

Plaintiffs point to one instance where they claim that evidence of actual confusion exists: a question posted on Amazon.com, where a consumer asked if "the can of Midnight Black," Defendants' product, was "the same as the spray, and the hanging trees?"  Plaintiffs' Response at ¶ 107.  While Defendants contend that this question is not evidence of actual confusion, but instead evidence that the consumer had differentiated between Defendants' and Plaintiffs' products and was attempting to ascertain the difference, a reasonable juror could conclude that the customer had confused the source of the different scents.  Making all inferences in the non-moving parties' favor, the statement could be read to imply that the potential customer understood all three products to be made by the Plaintiffs, and the inquiry to be whether the device that provided "Midnight Black" had the same scent as the contained in the spray and the hanging tree. A reasonable juror reading the statement in that way could conclude that the inquiry

represented a confusion as to the source of the "Midnight Black" scent.

At the same time, courts have concluded that questions about the source of goods is not necessarily evidence of actual confusion.  See, e.g., Gruner + Jahr United States Publ'g v. Merideth Corp., 79 F.Supp. 1222, 1233 (2d Cir. 1992) (evidence "that certain persons thought to inquire as to whether or not a relationship between a plaintiff and defendant existed" is evidence of that question "and not that such persons assumed that plaintiff and defendant were in any manner related); Nora Bevs., Inc. v. Perrier Grp. of Am. Inc., 269 F.3d 114, 124 (2d Cir. 2001) ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion."). Here, though, the questions were not about who produced the allegedly infringing goods, but about the relationship between different types of what a reasonable juror might conclude the inquirer thought were produced by the same company.

There is some slight evidence, then, which a jury could use to find evidence of actual confusion.  Plaintiffs do not point to any evidence of even that nature showing actual confusion between the "Bayside Breeze" and "Boardwalk Breeze" scents, though they do show that Defendants' witnesses confused the names of the scents.  Those executives are not consumers, however.  Plaintiffs also do not point to any evidence indicating the actual purchase of Defendants' products driven by the mistaken impression that they came from Plaintiffs.  Plaintiffs also do not provide any evidence that retailers selling the goods noted a frequent mix-up between the parties' products.  Moreover, considering the large volume of sales that these products enjoyed[14], evidence of a single

---

[14]Specific sales evidence has been sealed by the Court.

incident of actual confusion does not suffice for a reasonable juror to conclude that actual confusion existed in any widespread way. One incident of potential confusion does not convince the Court that a triable issue of fact exists related to actual confusion. See Nora Bevs. 269 F.3d 124 (district court did not err "in finding that two anecdotes of confusion over the entire course of competition constituted *de minimus* evidence insufficient to raise triable issues."). This factor falls for the Defendants.

### vi. Bad Faith

The Court next asks whether the alleged offenders' use of the mark was in good or bad faith. The question inquires "'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" Lang, 949 F.2d at 583 (quoting Edison Brothers Stores, Inc. v. Cosmair, Inc., 651 F.Supp. 1547, 1560, 2 U.S.P.Q.2d (BNA) 1013 (S.D.N..Y. 1987)). "A finding of good faith may be supported by, among other things, 'selection of mark that reflect's the product's characteristics.'" Arrow Fasterner Co. v. Stanley Works, 49 F.3d 384, 397 (2d Cir. 1995) (quoting Lang, 949 F.2d at 583). Evidence that the defendant "has requested a trademark search or has relied on the advice of counsel" also supports a finding of good faith. W.W.W. Pharm. Co., 984 F.2d at 575. Indeed, "[p]rior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." Id. Still, "intentional copying is not a requirement under the Lanham Act" and "intent is largely irrelevant in determining if consumers will likely be confused as to source." Lois Sportswear, Inc. v. Levi Straus & Co., 799 F.2d 867, 875 (2d Cir. 1986). By contrast, bad

faith is measured by an "'intent to confuse. There is a considerable difference between an intent to copy and an intent to deceive.'" <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 117 (2d Cir. 2009) (quoting 4 MCCARTHY ON TRADEMARKS § 23.113).

Plaintiffs point to the evidence cited above that shows that Handstands executives sought to develop scent profiles that mimicked both the "Black Ice" and "Bayside Breeze" scents. While Defendants dispute the persuasiveness of this evidence, a reasonable juror could certainly conclude that attempts to develop scents that mimicked Plaintiffs' and then to use names that at least echoed the ones that the Little Trees brands used represents an effort to copy from Plaintiffs and take advantage of the large sales and good will associated with their products. A reasonable juror could use the evidence recited above about the development of the scents to find that Defendants acted in bad faith.

Evidence therefore exists that Defendants attempted to copy Plaintiffs' scents and scent names, and "[e]vidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." <u>Bristol-Meyers Squibb Co. v. McNeil-P.P.C, Inc.</u>, 973 F.2d 1033, 1044 (2d Cir. 1992). While "'this factor alone is not dispositive, it bolsters a finding of consumer confusion.'" <u>Id.</u> (quoting <u>Charles of the Ritz Group v. Quality King Distrib.</u>, 832 F.2d 1317, 1322 (2d Cir. 1987)). Still, the question here is not whether Defendants engaged in bad-faith conduct, but whether that bad-faith conduct led to products that had a likelihood of confusing consumers as to the source of the goods. Indeed, "where there is no likelihood of confusion–as e.g., where the alleged infringing article is not in a sufficiently adjacent field–then an alleged infringer's intent becomes irrelevant, since an intent to do a wrong cannot transmute a lawful act into an unlawful act." <u>Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre</u>

44

Watches, 221 F.2d 464, 467 (2d Cir. 1955). Here, as the Court has explained, the products in question are dissimilar as a matter of law. Therefore, despite evidence a reasonable factfinder could use to find bad faith, the Court must find that Defendants' efforts to do a wrong did not succeed in creating trademark infringement. While this factor supports Plaintiffs' claim, that alone is insufficient to deny Defendants' motion in this respect.

### vii.    Quality of the Product

As to the quality of a defendant's product, "the senior user is entitled to protect 'the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user[.]'" W.W.W. Pharm. Co., 984 F.2d at 575 (quoting Scarves by Vera, Inc. v. Todo Imps. Ltd., 544 F.2d 1167, 1172 (2d Cir. 1976)). "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." Gruner + Jahr USA Publ., 991 F.2d at 1079. Still, "[p]roducts of equal quality may tend to create confusion as to source because of that very similarity of quality." Morningside Group, Ltd., 182 F.3d at 142.

This case contains no allegation that the Defendants' products are of a significantly lower quality than the Plaintiffs and that Defendants are attempting to take advantage of Plaintiffs' reputation by confusing the source of the goods and convincing consumers to buy Refresh Your Car! products because of Little Trees' reputation for quality. To the extent that the goods are of similar quality, the similar purpose of the products might lead consumers to be more easily confused. The parties offer no significant evidence on this

45

issue, however, and the Court will find that the evidence does not support a finding that the relative quality of the products plays a significant role in the existence of a likelihood of confusion between the parties' products.

### viii. Sophistication of Relevant Consumer Group

"Because likelihood of confusion 'must be assessed by examining the level of sophistication of the relevant purchasers' of the plaintiff's and defendant's services 'we must consider the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" Sports Auth., Inc., 89 F.3d at 965 (quoting W.W.W. Pharmaceutical, 984 F.2d at 575). "Consumer sophistication may be proved by direct evidence such as expert opinions or surveys." Star. Indus. v. Bacardi & Co., 412 F.3d 373, 390 (2d Cir. 2005). A court may also consider the "nature of the product . . . and its low price" in determining the likelihood of confusion. Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 219 (2d Cir. 2003) (citing Lever Brothers Co. v. American Bakeries Co., 693 F.2d 251, 259 (2d Cir. 1982) ("The ordinary purchaser of bread and margarine is a casual buyer, and the bustling, self-service atmosphere of a typical supermarket makes careful examination of products unlikely[.]").

The parties have not provided any particular information on the sophistication of typical buyers. As explained above, the Court may still consider the type of product and its cost in assessing the role that buyers' sophistication plays in the likelihood of consumer confusion. Here, evidence in the case indicates that the sales price of the products in question is relatively small, that those products are not complicated to use, and that they are sold in general-merchandise stores rather than in speciality shops to a specialized

46

clientele. No evidence indicates that buyers need mediation from sales clerks or other experts to understand the products and their use. Under those circumstances, consumers are unlikely to spend a great deal of time on their buying decisions. That situation makes confusion more likely.

### ix. Overall Finding on Trademark Infringement

Having applied the Polaroid factors, the Court finds that the evidence is insufficient for a reasonable juror to conclude that the products in question are sufficiently similar to create a likelihood of confusion as to the source of the goods. The decisive factor here is that the goods are not sufficiently similar to confuse buyers about their source. The Court will therefore grant the Defendants' motion with reference to the trademark infringement claim.[15]

### B.     Trademark Dilution

Defendants also seek summary judgment on Plaintiffs' trademark dilution claim. "Under federal law, an owner of a 'famous, distinctive mark' is entitled to an 'injunction against the user of a mark that is 'likely to cause dilution' of a famous mark.'" Starbucks Corp., 588 F.3d at 105 (quoting Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (quoting 15 U.S.C. § 1125(c)(1)). To prevail on a dilution claim, a

---

[15]Plaintiffs bring separate federal claims for infringement of a registered trademark and trademark infringement and unfair competition. See Amended Complaint, dkt. # 13, Counts I and II. The parties have not briefed those issues separately, and courts have concluded that "[t]o prevail on a trademark infringement and unfair competition claim under 15 U.S.C. §§ 1114(1), 1125(a), in addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with the plaintiff's goods." Starbucks Corp., 588 F.3d at 114. Summary judgment on both federal infringement counts is therefore appropriate.

plaintiff must show "that it owns the mark, that the mark is famous and distinctive, and that defendant's actions dilute the mark." Dual Groupe LLC v. Gans-Mex LLC, 932 F.Supp.2d 569, 573 (S.D.N.Y. 2013). "[F]ederal dilution is actionable in two situations: (1) dilution by 'blurring' and (2) dilution by 'tarnishment.'" Id. (quoting 15 U.S.C. § 1125(c)). Plaintiff pleads only blurring in this case. "'Dilution by blurring' is an 'association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.'" Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 111 (2d Cir. 2010) (quoting 15 U.S.C. § 1125(c)(2)(B)).

Dilution can exist "'regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.'" Id. (quoting 15 U.S.C. § 1125(c)(1)). Federal law provides a list of six "non-exhaustive" factors for courts to consider in evaluating a blurring claim: "(1) '[t]he degree of similarity between the mark or trade name and the famous mark'; (2) [t]he degree of inherent or acquired distinctiveness of the famous mark'; (3) '[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark'; (4) [t]he degree of recognition of the famous mark'; (5) '[w]hether the user of the mark or trade name intended to create an association with the famous mark'; and (6) '[a]ny actual association between the mark or trade name and the famous mark.'" Tiffany (NJ) Inc., 600 F.3d at 111 (quoting 15 U.S.C. § 1125(c)(2)(B)(i-iv)). "The analysis 'must ultimately focus on whether an association, arising from the similarity between the subject marks, impairs the distinctiveness of the famous mark–that is, the ability of the famous mark to serve as a unique identifier.'" Knowles-Carter v. Feyonce, Inc., 347 F.Supp.3d 217, 228 (S.D.N.Y. 2018) (quoting Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.,156 F.Supp.3d 425, 434 (S.D.N.Y. 2016)).

The parties disagree about whether a question of fact exists on Plaintiffs' dilution claim.

### i. Fame of Marks

Defendants argue that the marks in question here–"Black Ice" and "Bayside Breeze" are not famous and thus not entitled to protection from dilution. For a dilution claim, "the element of fame is the key ingredient . . . because" the fame requirement "narrows the universe of potentially successful claim" to those marks that are "truly famous[.]" Savin Corp., 391 F.3d at 449. "To obtain relief, a trademark owner must show that its mark is both famous and distinctive . . . because '[a] mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect.'" N.Y. Stock Exch., Ic. v. N.Y. Hotel, LLC, 293 F.3d 550, 556 (2d Cir. 2002) (quoting Nabisco, 191 F3d at 215). "[T]he Lanham-Act's anti-*dilution* protection extends only to those marks that are inherently distinctive, not to those that derive distinctiveness only from secondary meaning." Id. (emphasis in original). Federal law provides a test to determine whether a mark is famous:

> (A) . . . a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>> (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>> (iii) The extent of actual recognition of the mark.
>> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Under this statute, a mark "must possess more than 'niche' fame" to qualify for protection.  Burberry Ltd. v. Euro Moda, Inc., No. 08cv5781, 2009 U.S. Dist. LEXIS 53250, at *32 (S.D.N.Y. June 10, 2009) (quoting Dan-Foam A/S v. Brand Named Beds, LLC, 500 F.Supp. 2d 296, 307 n.90 (S.D.N.Y 2007)).  Courts have concluded that Congress intended to provide dilution protection to marks "only if they carried a substantial degree of fame."  Tcpip Holding Co. v. Haar Communs. Inc., 244 F.3d 88, 99 (2d Cir. 2001).  This fame "is difficult to prove" and "requires widespread recognition by the general public."  Coach Servs. v. Triumph Learning, LLC, 668 F.3d 1356, 1373 (Fed. Cir. 2012).  Courts have concluded that "a famous mark is one that has become a 'household name.'"  Id. (quoting Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1012 (9th Cir. 2004)).

The Court will assess evidence of the marks' fame through the statutory factors to help make this determination, recognizing that the Court is not required to apply all of these factors, and may consider any other "relevant" factors.  15 U.S.C. § 1125(c)(2)(A).

### a.    Advertising and Publicity of the Mark

Defendants contend that Plaintiffs have failed to produce sufficient evidence to demonstrate the duration, extent, or reach of advertising for the particular marks, and no evidence of the effects of that advertising on consumer protection.  As explained above, Plaintiffs contend that they advertise and publicize their marks extensively across the nation.  The question here, however, is not whether the "Little Trees" mark is a household name, but whether the "Black Ice" and "Bayside Breeze" marks are.  Plaintiffs do not accuse Defendants of diluting the distinctive and (perhaps) famous "Little Trees" mark; they point to two specific fragrances.  Plaintiffs admit that they do not advertise by

50

scent–though scents have individual pages on their website and in catalogs--and that they can provide no information on spending to promote the marks in question here. The Court must therefore find that no evidence supports a finding of extensive advertising and publicity for the marks have helped make them famous.

### b. Sales

Plaintiffs have submitted evidence that "Black Ice" enjoyed substantial sales during the time here in question, and that those sales have amounted to large revenues for the most popular scent in the industry in some product formats. See Sealed Declaration of Elizabeth Perry, dkt. # 117-40. The products are sold in major retailers nationwide, and account for tens of millions in yearly sales. Id. Sales and revenues for "Bayside Breeze" are significantly lower, as are the scent's sales rankings. Id. Still, yearly sales revenue for the product is in the millions of dollars. Id. Defendants do not dispute that the products in question have enjoyed the sales Plaintiffs report. They argue instead that this level of sales is not sufficient for a finding that the products are famous. They also contend that the products' fame cannot be separated from the "Little Trees" packaging, and that Plaintiff has not produced evidence that could separate sales based on that packaging and sales based on the marks in dispute.

The amount of sales reported for Black Ice, which are at least several times those of the Bayside Breeze scent, are insufficient to serve as evidence of a mark that is nationally famous with the general consuming public. See, e.g., Int'l Info Sys. Sec. Certification Cosortium v. Sec. Univ., LLC, No. 10cv1238, 2014 U.S. Dist. LEXIS 108853, at *34 (D. Conn. 2014) ("Although Plaintiff has shown that it has significant annual revenue

and that 80,000 individuals in more than 135 countries have obtained CISSP certification, this is insufficient to demonstrate recognition by the general consuming public.") (internal citations omitted). Plaintiffs' sales for these products are a mere fraction of the sales for companies like Nike and Hot Wheels, which courts have found possess the requisite sales to represent the sort of fame that qualifies under the dilution statute. See Luv N'Care, Ltd. v. Regent Baby Prods. Corp., 841 F.Supp.2d 753, 757 (S.D.N.Y. 2012) (noting that courts have found Nike–with at least $1 billion in yearly earnings–and Hot Wheels–with 37 years on the market, $350 million in advertising expenditures, and sales of 3 billion units over those years–are famous within the statute's meaning). Plaintiffs' sales do not approach the levels of nationally known brands and do not justify a finding that "Black Ice" and "Bayside Breeze" are famous.

### c. Actual Recognition

The parties dispute whether evidence exists to support a finding of widespread recognition of the marks. Here, Defendants point to an expert report in the form of a survey offered by David Neal, which purports to show that neither "Black Ice" nor "Bayside Breeze" are broadly recognized in the wider culture. Neal surveyed consumers and found that less than 40% were aware of Black Ice and around 25% were aware of the "Bayside Breeze" scent. See Declaration of Joel Steckel, dkt. # 108, at ¶ 49 (discussing Neal report in unsealed declaration). Defendants' use an expert, Joel Steckel, to challenge the reliability and conclusions of this report. See Id. at ¶¶ 48-80. They also move to prevent admission of this report. See dkt. # 91.

Assuming that this report is inadmissible and cannot be considered, the Court has

no evidence of the level of recognition of the products. The only evidence provided by the Plaintiffs that the consuming public recognizes the products is the evidence summarized above that Black Ice has appeared in popular culture, particularly in the cars driven by actors in movies and music videos, and that the Bayside Breeze product appeared once on screen in an HBO program and on social media. Plaintiffs do not provide their own fame survey. The Court finds that the evidence presented by the Plaintiffs does not support their claim that either product enjoys broad recognition among the general public or even among automotive air freshener consumers. Even a showing of fame within the particular market would be insufficient. See, e.g., Luv N'Care, Ltd. v. Regent Baby Prods. Corp., 841 F.Supp.2d 753, 758 (S.D.N.Y. 2012) (the present version of the act prohibiting trademark dilution includes "the phrase 'widely recognized by the general consuming public of the United States'" in order "to reject dilution claims based on niche fame, i.e. fame limited to particular channel or trade, segment of industry or service, or geographic region.'") (quoting Dan-Foam, 500 F.Supp.2d at 307 n. 90). Evidence that some television shows have depicted the products is insufficient to show fame even in a niche market. This factor, therefore, does not support a finding that the products were so widely known among the general public as to constitute a household name.

### d. Registration

The marks in question are registered. This factor could contribute to a finding of fame, but such registration is conclusive of nothing. See 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:106, at 24-293 (4th Ed.) (Finding that "one cannot logically infer fame from the fact that a mark is one of the millions on the federal Register. On the other hand, one could logically infer fame from a

lack of registration.").  Here, where all the other evidence conclusively establishes a lack of

fame among the general public for the marks, the mere fact of registration does not alter

the Court's conclusion.

### e. Conclusion as to Famousness

The Court therefore finds that no evidence supports a finding that either of the

marks in question are famous.  As a general matter, no evidence indicates that anyone

would consider either "Black Ice" or "Bayside Breeze" a household name.  Since the marks

are not "famous" in the sense required by the dilution statute, the Court will grant the

motion in this respect as well without considering whether dilution by blurring occurred.

### C.    State Law Claims

### i.    Trademark Dilution

Defendants also seek dismissal of Plaintiffs' New York trademark dilution claims.

New York law provides that "[l]ikelihood of injury to business reputation or of dilution of the

distinctive quality of a mark or trade name shall be ground for injunctive relief in cases of

infringement of a mark registered or not registered or in cases of unfair competition,

notwithstanding the absence of competition between the parties or the absence of

confusion as to the source of goods or services."  N.Y. Gen. Bus. L. § 360-l.  "To establish

a trademark dilution claim under New York law," a plaintiff "must show ownership of a

distinctive mark and a likelihood of dilution."  Sports Auth., Inc. v. Prime Hospitality Corp.,

89 F.3d 955, 966 (2d Cir. 1996).  "Dilution can consist of either blurring or tarnishment of

[the] mark."  Id.  Unlike federal law, the New York dilution statute "does not require a mark

to be 'famous' for protection against dilution to apply." Starbucks Corp., 588 F.3d at 114.

New York law uses six factors in assessing blurring: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." <u>N.Y. Stock Exch., Inc.</u>, 293 F.3d at 558. Under this statute, "the marks must be 'very' or 'substantially' similar and . . . absent such similarity, there can be no viable claim of dilution." <u>Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.C., Inc.</u>, 875 F.2d 1026, 1029 (2d Cir. 1989).

The Court's finding above that the marks are insufficiently similar to sustain a claim for infringement demonstrates that the marks are not substantially similar and forecloses the Plaintiffs' New York dilution claim as a matter of law. The Court will grant the motion in this respect. <u>See</u> <u>Tiffany (NJ)</u>, 600 F.3d at 111 (New York law requires that the marks be "substantially similar" or dilution cannot occur).

### ii. Unfair Competition

Plaintiffs' Amended Complaint raises a claim for unfair competition, which Defendants have answered, though none of their briefing addresses this particular claim directly. Still, "[u]nder Federal or State law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets." <u>Eagle Electronics v. Pico Prods., Inc.</u>, 256 A.D.2d 1202, 1203 (4th Dept. 1998). In the context of infringement and dilution, "[t]he test, under both the Lanham Act and the common law, is the likelihood that the consuming public will be confused as to the source of the allegedly infringing product." <u>American Footwear Corp. v. General Footwear Co.</u>, 609 F.2d 655, 664 (2d Cir. 1979). Courts have long concluded

55

that "the law of trademark infringement is but a part of the law of unfair competition, and the same test is applied in determining each claim." Id. (internal citations omitted).

Here, as the Court has decided that summary judgment is appropriate on Plaintiffs' claims for trademark infringement and trademark dilution, the Court will also grant summary judgment with reference to Plaintiffs' state-law unfair competition claim.

## IV.     CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment, dkt. # 84, is hereby GRANTED.  Because the Court's decision resolves this matter, Defendants' motion to strike Plaintiffs' jury demand, dkt. # 89, and Plaintiffs' motion to exclude expert testimony, dkt. # 91, are hereby DENIED as moot.  The Clerk of Court is directed to CLOSE the case.

**IT IS SO ORDERED**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: August 7, 2019